SEALED

#300008245

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

OCT 1 7 2023

CLERK, U.S. DISTRICT COURT
By A.a.
Deputy

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel., ) <br> SIDESOLVE LLC ) <br> ) <br> Plaintiff-Relator, ) <br> ) <br> v. ) <br> ) <br> MEADOWS MENTAL HEALTH POLICY ) <br> INSTITUTE, ) <br> ) <br> Defendant. ) | Case No. 3 -23CV2289-F <br> Jury Trial Demanded <br> FILED UNDER SEAL |

## COMPLAINT

1.     Relator Sidesolve LLC brings this action on behalf of itself and the United States of America against Defendant Meadows Mental Health Policy Institute for violations of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq*.

2.     This action seeks to recover funds that were loaned to Defendant through the federal Government's Paycheck Protection Program ("PPP") and forgiven as a result of false applications.

3.     Sidesolve LLC is a company that uses data to investigate large-scale corporate fraud. Its goal is to use the technology it is developing to protect individuals on private healthcare plans. It is currently developing its technology using public databases. It uses computational statistics to match entities across multiple resources such as databases, social media, corporate filings, and other

-1-

sources. From this broader picture, it finds fraud leads, which it follows up with a more traditional manual investigation. In sum, Sidesolve LLC uses its expertise and proprietary technology to both collect the scattered pieces of the fraud puzzle and also to put them together into a complete picture of the alleged fraud.

4.    While searching for potential PPP loan fraud in data released by the SBA, Sidesolve came across Defendant Meadows Mental Health Policy Institute, a think tank, that had applied for a PPP loan of $1,391,197. The loan was forgiven in its entirety, plus interest.

## JURISDICTION AND VENUE

5.    This Court has jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1331, 1345.

6.    Venue is proper in this district under 28 U.S.C. §§ 1391(b) and 31 U.S.C. § 3732(a), as Defendant transacts business in this jurisdiction and violations of the False Claims Act described herein occurred in this district.

## THE PAYCHECK PROTECTION PROGRAM

7.    During the COVID-19 pandemic, Congress passed the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"). Section 1102 of the CARES Act contains a program called the Paycheck Protection Program ("PPP"), a program administered by the U.S. Small Business Administration ("SBA") to provide economic relief to small businesses nationwide adversely impacted by the

coronavirus pandemic.

8.    Section 1102 of the CARES Act temporarily permitted SBA to guarantee 100% of the PPP loans. Section 1106 of the CARES Act provided for forgiveness of up to the full principal amount of qualifying loans guaranteed under the PPP.

9.    The CARES Act gives lenders delegated authority to process loan applications for PPP funding. SBA allowed lenders to rely on certifications of the borrowers in order to determine eligibility of the borrower and use of loan proceeds, and to rely on specified documents provided by the borrower to determine qualifying loan amount, and eligibility for loan forgiveness.

10.    The Economic Aid Act (P.L. 116-260, in the Consolidated Appropriations Act of 2021), authorized and funded a Second Draw PPP Loan program.

11.    For Second Draw PPP Loans, lenders were compensated by the federal government via processing fees based on the balance of the financing outstanding at the time of final disbursement, in the amount of five (5) percent for loans of more than $50,000 and not more than $350,000, and in the amount of three (3) percent for loans above $350,000.

12.    Each borrower certified on the Second Draw loan applications that they were eligible to receive the loans under the program guidelines and that their applications and supporting documentation were accurate.

13.    Borrowers were able to seek forgiveness of the loan if the funds were used

for eligible payroll costs, payments on business mortgage interest payments, rent, or utilities.

## PPP REGULATIONS FOR THINK TANKS

14.    The SBA opened applications for Second Draw PPP Loans on January 15, 2021.

15.    Paragraph 7(a)(37)(A)(iv)(III)(bb) of the Small Business Act, added by the Economic Aid Act (P.L. 116-260, in the Consolidated Appropriations Act of 2021), which authorized and funded the Second Draw program, excluded from eligibility:

> any business concern or entity primarily engaged in political or lobbying activities, which shall include any entity that is organized for research or for engaging in advocacy in areas such as public policy or political strategy or otherwise describes itself as a think tank in any public documents.

(This definition shall hereinafter be referred to generally as "Think Tanks.")

16.    The Interim Final Rule for the Second Draw Loans, effective January 12, 2021 and published January 14, 2021, thrice indicated that Think Tanks were not eligible for Second Draw Loans: Section C. Excluded Entities (86 FR 3715) (describing Think Tanks as a "prohibited borrower"); IV(e) Who is not eligible for a Second Draw PPP Loan? (86 FR 3718-19); and IV(g)(3)(ii)(E) (86 FR 3721) (requiring certification that applicant is not a Think Tank).

17.    Accordingly, every version of the Second Draw Borrower Application Form,

starting January 8, 2021, required that "The authorized representative of the Applicant must certify in good faith to all of the below by initialing next to each one" that "The Applicant is not a business concern or entity primarily engaged in political or lobbying activities, including any entity that is organized for research or for engaging in advocacy in areas such as public policy or political strategy or otherwise describes itself as a think tank in any public documents." Defendants could not have obtained a Second Draw PPP Loan without knowingly making this false certification.

18.    On June 27, 2023, the USAO for the District of Massachusetts announced a settlement with the Institute for Policy Studies (IPS), a nonprofit headquartered in Washington, D.C., to resolve allegations that IPS falsely certified that it was eligible to receive a Second Draw Loan.[1] According to the office's press release:

> IPS conducts research and publishes reports to influence public policy. As detailed in the settlement agreement, on Feb. 11, 2021, IPS submitted an application for a Second Draw PPP loan from SBA. In its application, IPS certified that it was "not a business concern or entity primarily engaged in political or lobbying activities, including any entity that is organized for research or for engaging in advocacy in areas such as public policy or political strategy or otherwise describes itself as a think tank in any public documents." But, as IPS admits, IPS has described itself as a "think tank" in various sections of its website, on LinkedIn, and in various public documents, including reports and press releases. Per its

---

[1] https://www.justice.gov/usao-ma/pr/think-tank-agrees-pay-more-500000-resolve-allegations-it-falsely-certified-its

corporate bylaws, "The purpose of IPS is to conduct research to produce publications, and to educate the public on important matters of public policy." Among many other objectives, IPS' Strategic Plan for 2021-2022 included lobbying activities such as "leveraging public scholarship for social movements with progressives in Congress."

19.    IPS repaid $501,161.92 as restitution, constituting the loan forgiveness amount, including interest, and the Lender Fee.

20.    After they were permitted to receive First Draw funding, Congress expressly determined that Think Tanks should be excluded from the Second Draw PPP Loans. Accordingly, Defendant should be required to repay its individual loan forgiveness and processing fees, plus penalties.

## PARTIES

21.    Relator Sidesolve LLC is a company that uses data to investigate scaled corporate fraud.

22.    Defendant The Meadows Mental Health Policy Institute ("the Meadows Institute") is a registered non-profit organization under the IRS code section 501(c)(3). Its principal address is 3003 Swiss Avenue, Dallas, TX 75204.

23.    The Meadows Institute is registered as a client under the Lobbying Disclosure Act.

## FACTUAL ALLEGATIONS

24.    On March 20, 2021, Meadows Mental Health Policy Institute for Texas was approved for a Second Draw PPP loan in the amount of $1,391,197 by Bank of Oklahoma Financial Corporation (BOKF), National Association. The amount forgiven was $1,396,955.

25.    Meadows Mental Health Policy Institute for Texas listed NAICS code 813319 (other social advocacy organizations) on its PPP loan application.

26.    The Meadows Institute has posted its mission statement on its website:

> Independent and nonpartisan, the Meadows Mental
> Health Policy Institute works at the intersection of policy
> and programs to create equitable systemic changes so all
> people in Texas, the nation, and the world can obtain the
> health care they need.

27.    The website further explains that "the Meadows Institute has become Texas's most trusted source for results-oriented information and analysis of effective and efficient mental health policy and programs."

28.    The Meadows Institutes Annual Reports further emphasize its research and policy advocacy.

29.    For example, its 2020 Annual Report begins with the following statement: "The Meadows Mental Health Policy Institute provides independent, nonpartisan, data-driven, and trusted policy and program guidance that creates equitable

systemic changes so all Texans can obtain effective, efficient behavioral health care when and where they need it."

30.     Specific references to advocacy efforts on its website include:

- [T]he Institute joined a dozen top national mental health organizations in weekly CEO coordination meetings to align national advocacy efforts for pandemic-related mental health and substance use issues, advancing priorities such as adding audio-only care to Medicare and expanding mental health and substance use disorder block grant funding to maximize state-level flexibility in responding to unprecedented challenges and needs.

- In response to requests from county officials across Texas, in March we issued policy guidance on the potential release of non-violent offenders from jail as part of the pandemic response. This was shared with the Office of the Governor, which later issued its own guidance consistent with our recommendations.

- [T]he Institute released the first in a series of white papers examining how the economic impacts of the pandemic were likely to increase rates of suicide, projecting an additional 300 lives could be lost each year in Texas and more than 4,000 nationwide. This drew wide-ranging attention from lawmakers and the national press, including a CNN.com op-ed by Former Ohio Governor John Kasich and Meadows Institute Board Member Henry Harbin advocating that "America's mental health COVID-19 recovery needs to start now."

- From a policy standpoint, we worked with state and federal policymakers to add a Texas perspective as regulations and relief dollars were contemplated, and partnered with philanthropists, providers, and advocates to ensure Texans received the flexibilities and resources they needed.

- [T]he Institute leveraged our reputation as a trusted source for data-driven information by reaching beyond Texas to join our national partners in confronting COVID-19's dramatic effects on our economy and daily lives, including its impact on mental health and addiction. We continued issuing white papers detailing the recession's impact on suicide and drug overdose deaths, and highlighted immediately actionable steps to reduce their toll and save tens of thousands of lives. This helped frame a national discussion and kept federal, state, and local policymakers informed.

- Through [the pandemic], the Meadows Institute worked with policymakers, providers, funders, and other groups to ensure they had expert counsel as they adapted to ever-changing state and federal regulations and guidance.

31.   The Meadows Institute also declared that, "[l]ooking ahead to 2021, we will continue to promote sound policy and equitable solutions to transform mental health care in Texas and the nation."

32.   The Meadows Institute's Form 990 for 2020 further solidifies that the Institute is a Think Tank engaged in lobbying efforts. Its mission is stated as "to provide independent, non-partisan, and trusted policy and program guidance that creates systemic changes so all Texans can obtain effective, efficient behavioral health care when and where they need it."

33.   It lists as its largest programs:

- Improve state level policy ($2.9M in expenses) – state and local regulations, the way they are implemented, and the way public and private health care funding flows all affect what health care is delivered and how. The Meadows Institute provides Texas leaders with the best

data and research available when they make decisions about laws, implementation strategies, and how to fund delivery systems to provide effective and quality care.

- Develop local behavioral health systems ($8.4M in expenses) – the Meadows Institute puts policy into practice, and our policy recommendations are based on what is happening in the real world. The Meadows Institute works on the ground in every region of the state, so we have first-hand knowledge of community capacity, innovations, and immediate and emerging community needs. This unique position informs the policy recommendations we bring to Austin…

34. The Meadows Institute checked the "Yes" box for the question "Did the organization engage in lobbying activities, or have a section 501(h) election in effect during the tax year?" As a result, it had to file a Schedule C, which indicates that for 2020, the Meadows Institute spent $491,757 in "Total lobbying expenditures to influence a legislative body (direct lobbying)." This amount rose to $705,028 in 2021.

35. Accordingly, the Meadows Institute was a Think Tank. It primarily engaged in political or lobbying activities, including having been organized for research and engaging in advocacy in public policy, i.e., behavioral health policy and spending. The Meadows Institute was not eligible for a Second Draw PPP Loan.

## COUNT I
## VIOLATIONS OF 31 U.S.C. § 3729
## FALSE CLAIMS ACT

36.    Relator hereby incorporates and realleges herein all other paragraphs as if fully set forth herein.

37.    As set forth above, Defendant knowingly presented or caused to be presented false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A).

38.    As set forth above, Defendant knowingly made, used, or caused to be made or used, false records or statements material to false claims, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

39.    Due to Defendant's conduct, the United States Government has suffered substantial monetary damages and is entitled to recover treble damages and a civil penalty for each false claim. 31 U.S.C. § 3729.

40.    Relator is entitled to reasonable attorneys' fees, costs, and expenses. 31 U.S.C. § 3730(d)(1).

## PRAYER FOR RELIEF

WHEREFORE, Relator prays for judgment against Defendant:

    (a) awarding the United States treble damages sustained by it for each of the false claims;

    (b) awarding the United States the maximum civil penalty for each of the false claims, records, statements, and unlawful acts;

(c) awarding Relator the maximum share of the proceeds of this action

and any alternate remedy or the settlement of any such claim;

(d) awarding Relator litigation costs, expenses, and reasonable attorneys'

fees;

(e) granting such other relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Relator hereby respectfully demands trial by jury on all issues and

counts triable as of right before a jury.

Respectfully submitted,

Jason Marcus (*pro hac vice* pending)
Georgia Bar No. 949698
**Bracker & Marcus LLC**
3355 Lenox Road, Suite 660
Atlanta, Georgia 30326
Telephone: (770) 988-5035
Facsimile: (678) 648-5544
Jason@fcacounsel.com